UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

**STEPHEN L. FARRAR**,                                    Case No. 6:15-cv-0618-KI

                    Plaintiff,                           OPINION AND ORDER

        v.

**COLETTE PETERS, Director, O.D.O.C.;
SUPT. J. PREMO, Asst. Supt.; M.
YODER; CAPT. D. LONG; C. COFFEY,
OSP Medical Services; S. SHELTON,
M.D., Medical Director, O.D.O.C.; J.
RUSSELL, BHS Administrator; T.
BYERLY, BHS Manager OSP; B
MILLER, BHS (PMHNP) OSP; C.
GORDON, BHS (QMHP) OSP; C.
FARRELL (QMHP) OSP; LEONARD
WILLIAMSON, Inspector General;
GARRETT LANEY, Deputy Inspector
General;  E. BRYANT, Inspector 2; J.
NOFZIGER, OSP; D. PARKER, OSP; K.
ENGLE, C/O OSP; DR. GULICK, SRCI**,

                    Defendants.

KING, Judge:

Plaintiff, an Oregon Department of Corrections' inmate, brings this civil rights action pursuant to 42 U.S.C. § 1983.  Currently before the court are the defendants' motions for partial summary judgment (ECF No. 59) on the basis of exhaustion and for summary judgment on the merits (ECF No. 111).

## BACKGROUND

In this complaint, plaintiff alleges five claims against the defendants:  denial of due process (claims one and two); retaliation and deliberate indifference in cell assignments (claim four); and unconstitutionally inadequate medical care (claims three, five, and a supplemental claim).

Defendants previously moved for partial summary judgment against plaintiff's fourth claim on the basis that plaintiff failed to exhaust his administrative remedies as to that claim.  I deferred that motion pending the outcome of defendants' motion for summary judgment on the merits as to all claims.

Since the claims involve disparate legal and factual issues, I summarize the facts relevant to each claim below.

## LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The initial burden is on the moving party to point out the absence of any genuine issue of material fact.  Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  On a motion for summary judgment, the

court "must view the evidence on summary judgment in the light most favorable to the

non-moving party and draw all reasonable inferences in favor of that party."  *Nicholson v.*

*Hyannis Air Service, Inc.*, 580 F.3d 1116, 1122 n.1 (9th Cir. 2009) (citation omitted).

## DISCUSSION

I.    <u>First Claim</u>

Plaintiff challenges an October 2014 misconduct report and subsequent disciplinary

proceeding, alleging various officials violated his due process rights.  He alleges the claim

against Colette Peters (ODOC Director), Leonard Williamson (Inspector General), Jeremy

Nofziger (Correctional Hearings Officer), Garrett Laney (Deputy Inspector General), and

Ephraim Bryant (Inspector General's Office).  Compl. 47.[1]

In addition, although he does not plead retaliation as a separate claim, plaintiff alleges he

believes the charge was brought in retaliation for his having filed complaints, grievances and

kytes against Captain Dennis Long.  Compl. 14, ¶ 17.

As an initial matter, plaintiff fails to allege Peters was sufficiently involved to sustain a

claim against her.  Indeed, he alleges nothing indicating Peters was involved in initiating the

misconduct report or administering the subsequent disciplinary hearing, or that she knew about

either.  She is entitled to summary judgment on this claim.

---

[1] Every page of plaintiff's Complaint is numbered.  In addition, some of his paragraphs
are numbered.  I always cite the page number; I cite the paragraph number when there is one.

A.     Relevant Facts

On October 17, 2014, plaintiff received a misconduct report–authored by Bryant and reviewed by Laney–charging him with Drug Possession (conspiracy) and Distribution I.  The report reflected that investigators learned plaintiff distributed heroin for another inmate, Stephen Kessler, between April 2012 and September 30, 2014, which was confirmed by confidential informant statements, heroin located in a cell, and positive urine analysis of suspect inmates. Further information was contained in a confidential report.  Nofziger Decl. Attach. 1, at 3.

On October 27, 2014, officers brought plaintiff to the hearing room, with his hands handcuffed behind him.  Plaintiff gave the hearings officer a returned envelope containing a letter plaintiff had written to Kessler at OSCI on October 1, 2014.  The envelope was stamped "not in ODOC."  Plaintiff also submitted a kyte seeking dismissal of the charges on the basis of insufficient evidence.  Plaintiff alleges Nofziger read aloud the confidential report, but it was difficult to understand.  Plaintiff told the hearings officer he was not involved.  Nofziger read that a confidential informant in April of 2012 said plaintiff and another inmate dealt heroin for Kessler.  Another confidential informant repeated this statement in September of 2014.  Further, the hearings officer related that a confidential informant reported plaintiff had sold a gram of heroin to inmate Gartner, that Gartner was planning on taking a gram of heroin with him to DSU, and that heroin was found in Gartner's cell.

The hearings officer found plaintiff guilty of Drug Possession and Distribution I[2] and gave plaintiff a punishment of 90 days in DSU, 14 days loss of privileges, a $100 fine, and loss of visiting privileges.

B.     Due Process

Due process protections called for by the Supreme Court in this context require prison officials to provide the inmate with (1) written notice (at least 24 hours before the hearing) that describes the charge, a description of the evidence against the inmate, and an explanation for the disciplinary action taken; (2) an opportunity to present documentary evidence and call witnesses, unless calling witnesses would interfere with institutional security; and (3) legal assistance where the charges are complex or the inmate is illiterate. *Wolff v. McDonnell*, 418 U.S. 539, 563-70 (1974). When prison officials limit an inmate's efforts to defend himself, they must have a legitimate penological reason. *Koenig v. Vannelli*, 971 F.2d 422, 423 (9th Cir. 1992) (prison officials gave legitimate penological reason to deny inmate a requested test performed at a laboratory to confirm drug test results). Officials may explain their reasoning at the disciplinary hearing or later. *Id.*

Plaintiff alleges he was denied inadequate written notice, deprived of his right to an investigation, denied of the right to call witnesses, and denied of his right to prepare a defense.

_____

[2]"An inmate commits Drug Possession if he/she possesses a controlled substance." OAR 291-105-0015(1)(g). Additionally, "[a]n inmate who attempts or conspires to commit a rule violation shall be found in violation of the rule and shall be subject to appropriate sanctions on the same basis as if the inmate had committed the rule violation." OAR 291-105-0028(11)(b). An inmate commits Distribution I if the inmate "[d]istributes or has distributed to him/her any controlled substance, intoxicant, drug paraphernalia or money in the amount of $10 or more" or possesses any of these items "which have been packaged for distribution." OAR 291-105-0015(4)(f)(A) and (B).

He also argues the decision was based on insufficient evidence, relied on stale evidence, and presented inadequate findings.  Finally, he alleges the administrative review was biased.

    1.    <u>Notice (Paragraph a)</u>

Plaintiff alleges he was given inadequate written notice of the charges, consisting entirely of references to confidential information, which affected his ability to prepare a defense or a witness list.  Compl. 48, ¶¶ (a) and (d).[3]

The written notice of the charges must be sufficient to inform the prisoner "of the charges and to enable him to marshal the facts and prepare a defense." *Wolff*, 418 U.S. at 564.  However, according to ODOC rules, confidential informant testimony must remain confidential.  OAR 291-105-0028(9)(k)(A).  The notice identified the kind of drug, the inmate for whom plaintiff was purportedly distributing the drug, and the relevant dates.  I find the misconduct report satisfied due process.  There is no due process requirement that plaintiff have access to confidential information prior to the hearing and he was given the details of the investigation at the hearing itself.

Plaintiff takes issue with the fact that he did not learn about the confidential information until the hearing itself, thus depriving him of the right to prepare a defense.  Compl. 13, ¶ 13; Pl.'s Resp. 10.  The use of confidential information in a prison disciplinary hearing does not violate due process as a matter of law so long as the hearings officer undertakes a reliability analysis, which I discuss below. *Zimmerlee v. Keeney*, 831 F.2d 183, 186 (9th Cir. 1987).

---

[3]Plaintiff alleges "confidential information was deleted" from the misconduct report, but he does not explain or substantiate this statement.  Compl. 48, ¶ (a).

Plaintiff also complains the misconduct report incorrectly states he was placed in administrative housing pending the outcome of the investigation, when he was instead returned to general population. Nofziger Decl. Attach. 1, at 3 ("Inmate has been placed in Administrative Housing pending the outcome of this investigation"). Plaintiff believes the statement implied to Nofziger that the inspectors were following security threat procedures by "immediately placing plaintiff in lockdown separated from general population." Pl.'s First Aff. ¶ 30. If plaintiff believes the information implied to Nofziger that plaintiff was dangerous or guilty, his argument fails on two grounds. There is no evidence Nofziger considered plaintiff's housing placement as evidence at the hearing and, regardless, plaintiff had an opportunity to correct the record at the hearing.

Plaintiff additionally claims the fact that he was not placed in administrative housing suggests prison officials did not believe Gartner initially. *Id.* ¶ 38. Plaintiff presents no evidence that his placement–whether in administrative housing or not–affected Nofziger's review of the evidence. Additionally, placement in segregation can be based on many different reasons, including seriousness of the offense and security of the facility. OAR 291-105-0021(3). Finally, plaintiff had an opportunity to correct the record at the hearing.

2.      Conduct at the Hearing (Paragraphs c, d, e and g)

In paragraph (c), plaintiff alleges he should have been allowed a directed investigation into the alleged charges. Plaintiff may be referring to OAR 291-105–0028(8) which allows for an investigation at the inmate's request if the information sought would constitute a defense or mitigate the violation. First, failure to follow a rule does not constitute a due process violation as a matter of law. *Walker v. Sumner,* 14 F.3d 1415, 1419-20 (9th Cir. 1994), *overruled on other*

*grounds by Sandin v. Conner*, 515 U.S. 472, 483-84 (1995).  Second, plaintiff does not allege or present evidence that his request for such an investigation was denied.

In paragraph (d), plaintiff complains he could not call witnesses to refute the allegations. Due process protections include the ability of an inmate to call witnesses in his defense when to do so would not be "unduly hazardous to institutional safety or correctional goals."  *Wolff*, 418 U.S. at 566.  However, "[c]onfrontation and cross examination are not generally required and are left to the sound discretion of the prison official."  *Zimmerlee*, 831 F.2d at 187 n.2.

Plaintiff asserts he would have called Kessler and Gartner, but Nofziger testifies he would have denied those requests.  First, Nofziger believed both inmates would have given repetitive testimony as both had already given statements about the events.  Nofziger Decl. ¶¶ 6, 7. Second, Nofziger believes both Gartner and Kessler would have caused security concerns.  *Id.* Plaintiff narrowly interprets those security concerns, arguing that conditions in the hearing room make it "impossible for any prisoner to pose a security threat to staff or inmate" during the hearing.  Pl.'s First Aff. ¶¶ 23, 26.  Defendants point out that their security concerns are not just those at the hearing itself, but rather concerns about more general issues in the prison population. For example, Nofziger reports, calling Kessler would have caused security concerns because of the central role he played in the distribution of heroin.  *See Wolff*, 418 U.S. at 567 (risk of reprisal and potential for "havoc inside the prison walls").

In any event, as Nofziger noted, plaintiff failed to present a list of questions he wanted asked of Kessler.  OAR 291-105-0028(9)(b) (inmates must present a witness request in writing "and the questions sought to be posed to each person").  In paragraph (g), plaintiff contends he was mislead when the prison informed him Kessler was "not in O.D.O.C," which plaintiff says

deprived him of calling Kessler as a witness.  First, as defendants point out, the exhibit itself is missing the name of the addressee.  If I accepted plaintiff's statement that it is a copy of an envelope addressed to Kessler, plaintiff's report is that his letter to Kessler, dated October 1, was returned to him on October 7, a week before issuance of the misconduct report.  Compl. 12, ¶ 9.  Given this timing, it cannot be evidence defendants were trying to keep plaintiff from calling Kessler as a witness.  Finally, plaintiff provides no evidence he attempted to call Kessler as a witness once he received the misconduct report, or what he would have asked him.  Pl.'s First Aff. Ex. 15 (defense statement indicating only that plaintiff prepared legal work for Kessler); OAR 291-105-0028(9)(a) (witnesses "may include inmates, employees, or other persons. Testimony may be taken in person, by telephone, or by written report or statement").

Plaintiff alleges in paragraph (e) that the hearings officer read the confidential information too fast, and that plaintiff was handcuffed so he could not take notes.  Plaintiff also emphasizes his mental health condition, implying that he had difficulty understanding the events. Plaintiff fails to raise a genuine issue of material fact to survive summary judgment on this claim. First, plaintiff does not indicate he asked the hearings officer to read anything again, and Nofziger testifies plaintiff "was given the opportunity to ask for me to repeat anything I stated[.]" Nofziger Decl. ¶ 8.  Second, plaintiff attests that he forgot to take his mental health medications, Geodon for schizophrenia, and Prozac for depression and panic attacks, that morning.  Pl.'s First Aff. ¶ 26.  The medical record undermines plaintiff's assertion about the severity of his mental health impairment, as I discuss in detail below.  Regardless, plaintiff did not request the assistance of an employee, inmate, or other approved person, which would have been granted in the event his capacity or ability to understand the charge or his rights was in question.  *See* OAR

Page 9 - OPINION AND ORDER

291-105-0056(4)(b) (assistance "will be ordered" where assistance is necessary for language barriers or competence and capacity issues).

          3.     <u>Sufficient Evidence (Paragraphs b, f and h)</u>

As for the decision on the merits, a decision disciplining a prisoner must be supported by "some evidence" to comply with the due process clause. *Bruce v. Ylst*, 351 F.3d 1283, 1287 (9th Cir. 2003) (citing *Superintendent, Mass. Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 454 (1985)). "Evidence must meet minimal standards of reliability." *Toussaint v. McCarthy*, 926 F.2d 800, 806 (9th Cir. 1990). A court does not "reweigh the evidence; rather, 'the relevant question is whether there is any evidence in the record that could support the conclusion.'" *Bruce*, 351 F.3d at 1287 (quoting *Hill*, 472 U.S. at 455-56). The Constitution does not mandate that the evidence logically preclude any conclusion other than the one reached by the hearings officer. *Hill*, 472 U.S. at 457.

Plaintiff complains in paragraphs (f) and (h) about the hearings officer's reliance on confidential informants without ascertaining their reliability or the age of the statement. "[A] prison disciplinary committee's determination derived from a statement of an unidentified inmate informant satisfies due process when (1) the record contains some factual information from which the committee can reasonably conclude that the information was reliable[.]" *Zimmerlee*, 831 F.2d at 186.

> Reliability may be established by: (1) the oath of the investigating officer appearing before the committee as to the truth of his report that contains confidential information, (2) corroborating testimony, (3) a statement on the record by the chairman of the committee that he had firsthand knowledge of sources of information and considered them reliable based on the informant's past record, or (4) an *in camera* review of the documentation from which credibility was assessed.

*Id.* at 186-87.  Review of the reliability determination and the safety determination should be deferential.  *Id.* at 187.

Nofziger had two confidential informant statements tying plaintiff to the beginning and end of the heroin distribution activity, and a corroborating confidential statement that plaintiff sold heroin to Gartner.  Compl. 13, ¶ 13; *Zimmerlee*, 831 F.2d at 187 (reliability established in part by corroborating testimony).  Nofziger reported that heroin was found in Gartner's cell, and that Gartner had tested positive for opiates.  Contrary to plaintiff's argument on the age of the information, Nofziger was entitled to rely on information from 2012 when the misconduct report indicated the possession and distribution activity had been ongoing since April of 2012.  Finally, Nofziger's report states that he found the confidential informants to be believable, and he attests in his declaration that the information was credible.  Nofziger Decl. ¶ 4.  Undertaking a deferential review, I find plaintiff has failed to raise a genuine issue of material fact demonstrating the unreliability of the confidential informants.  Furthermore, Nofziger's findings are sufficiently detailed.

In paragraph (b), plaintiff challenges the sufficiency of the evidence.  He provides letters and affidavits from Gartner disputing Nofziger's findings.  Pl.'s First Aff. Ex. 19-21, 25.  He also provides misconduct reports and findings from two other inmates also charged with distributing heroin for Kessler and declarations from those inmates.  *Id.* Ex. 22-24, 26.  He insists he was providing only legal assistance to Kessler.  *Id.* ¶ 28.  He notes he was not immediately placed in DSU for violating rules and "selling one gram of heroin to Gartner on 9-16-14 that could kill 6 to 8 people," *id.* ¶ 38, and that Gartner was not dry celled.  *Id.* ¶ 39.

Page 11 - OPINION AND ORDER

In determining whether the "some evidence" standard is met, I am not charged with reweighing the evidence or assessing the credibility of the evidence.  Plaintiff concedes he knew both Kessler and Gartner.  *Id.* ¶¶ 28, 34.  The fact that he was not immediately placed in DSU was a factor he could have pointed out to Nofziger.  The fact that Gartner was not dry celled is not persuasive since by plaintiff's own exhibit dry cell placement is only appropriate when corrections officers have a reasonable suspicion to believe an inmate is carrying contraband internally.  *Id.* Ex. 18.  Plaintiff disputes how much heroin was found in Gartner's cell and disputes that Gartner gave a positive U/A sample, but he points only to statements made by Gartner now.  I am not to substitute my judgment for that of prison officials, so long as the decision had "minimally stringent" evidentiary support.  *Castro v. Terhune*, 712 F.3d 1304, 1314 (9th Cir. 2013).

Plaintiff implies defendants fabricated his sale of heroin to Gartner.  He points to a misconduct report and hearing decision for another inmate involving a sale of heroin to Gartner a month earlier.  Here, however, Nofziger pointed to confidential information indicating Gartner received heroin from plaintiff on September 16, 2014.  *See* Pl.'s First Aff. Ex. 22-24.  This is sufficient to meet the "some evidence" standard.  *Zimmerlee*, 831 F.2d at 186-87.  Plaintiff's final piece of evidence is from a disciplinary hearing involving a second inmate, which simply underscores the "compartmentalized" structure of Kessler's operation.  *Id.* Ex. 26.  In the end, the Constitution "does not require evidence that logically precludes any conclusion but the one reached" by the hearings officer.  *Hill*, 472 U.S. at 457.  Nofziger's findings were supported by "some evidence."

In sum, Nofziger, Laney, and Bryant are entitled to summary judgment and they are dismissed with prejudice.

### 4.    Administrative Review (Paragraph I)

Finally, plaintiff alleges the same defendants who investigated the incident, wrote the misconduct report and presented evidence to the hearings officer also performed the administrative review, thus denying him of an impartial administrative review.  To the contrary, Inspector Bryant prepared the misconduct report.  Hearings Officer Nofziger conducted the hearing.  Inspector General Williams performed the administrative review.  This claim must be dismissed.  In any event, there is no constitutional right to have an appeal processed in a certain way.  *Ramirez v. Galaza*, 334 F.3d 850, 860 (9th Cir. 2003).  Williamson is entitled to summary judgment on this claim.

### B.    Retaliation

Although plaintiff does not plead retaliation as a separate claim, he does specifically allege in his Complaint that he believes the charge was brought in retaliation for his having filed complaints, grievances, and kytes against Captain Dennis Long.  Compl. 14, ¶ 17.  However, plaintiff fails to raise a genuine issue of material fact establishing the elements of a First Amendment retaliation claim.  The misconduct report and the disciplinary findings undermine the possibility that any reasonable juror could conclude plaintiff's protected activity was a "substantial or motivating factor" behind the defendants' conduct.  *Brodheim v. Cry*, 584 F.3d 1262, 1271 (9th Cir. 2009) (the third element in a First Amendment retaliation claim).  Additionally, plaintiff fails to raise a genuine issue of material fact disputing that disciplinary

charges for heroin distribution do not support a legitimate penological goal. *Id.* at 1269 (the fifth

element in a First Amendment retaliation claim).

II.    <u>Second Claim</u>

Plaintiff also challenges a May 2014 misconduct report and subsequent disciplinary

proceedings, arguing defendants Kennan Engle (Correctional Officer), Denise Parker

(Correctional Hearings Officer), and Williamson violated his due process rights.

On May 26, 2014, Engle charged plaintiff with Contraband I, False Information to

Employees I, and Distribution I.  In the misconduct report, Engle reports that he watched plaintiff

put something small in inmate Britt Brock's palm.  Engle saw plaintiff holding something in his

hand.  Engle ordered plaintiff to show what was in his hand, at which time plaintiff showed

Engle a small piece of what looked like plastic wrap.  Plaintiff threw the plastic away at Engle's

direction.  Engle then approached Britt and ordered him to empty his pockets.  Britt held on to

something in his right hand, tried to put it behind his back, and then put whatever was in his hand

into his mouth.  Officers handcuffed Britt and took him to DSU where he admitted to taking

Neurontin.  When Engle asked plaintiff if he passed anything to Britt he said no.  Plaintiff then

said he passed the piece of plastic to Britt.  Plaintiff admitted he was prescribed Neurontin.

Parker postponed the disciplinary hearing to allow plaintiff to watch a surveillance video.

At the June 10, 2014 disciplinary hearing, Parker denied plaintiff's request to call Britt as a

witness.  She found plaintiff in violation of Distribution II, Contraband I, and Disobedience of an

Order I.[4]  She imposed a punishment of 25 days in DSU, 14 days loss of privileges, and a $35 fine suspended pending no Level 1 or II rule violations.

Plaintiff disputes that Parker was impartial, takes issue with her review of the video, and asserts there was insufficient evidence to support her decision.  Compl. 50, ¶¶ (a), (d).  He alleges a denial of due process when Parker refused to call Brock as a witness, refused to allow investigation into favorable evidence, and based her decision on insufficient evidence of his wrongdoing.  Compl. 50, ¶¶ (b), (c), and (d).  Finally, he alleges a violation of his due process rights for failure to provide an impartial administrative review process.

Plaintiff provides a summary of the surveillance video, which he contends shows he passed a white, folded piece of paper to Britt, who placed it in his front left pocket.  Plaintiff then showed Engle a piece of plastic oatmeal bag with a few oats in it.  Plaintiff threw the bag out and then went to work.  The video then shows Engle ordered Brock to empty his pockets.  Brock pulled the contents out of his left pocket with his left hand and placed them on the counter.  The video then shows Brock pulled the contents out of his right pocket and quickly placed something into his mouth using his right hand.  Pl.'s First Aff. ¶¶ 64-70.  Based on plaintiff's description of the video, and the fact that he contends the video clearly shows he passed Britt a piece of white paper, which went into Britt's left pocket, when Britt took the Neurontin out of his right pocket, I will need to watch the video in order to determine whether the video constitutes exculpatory

---

[4] An inmate commits Distribution II if he "[d]istributes or has distributed to him/her or manufactures contraband that creates a threat to the safety, security and orderly operation of the facility[.]"  OAR 291-105-0015(4)(g)(A).  Contraband I includes possessing any intoxicant. OAR 291-105-0015(1)(d).  Disobedience of an Order I occurs when an inmate "overtly refuses to promptly, or in a timely manner, comply with a valid order, which creates a threat to the safety, security, or orderly operation of the facility (such as when one or more other persons are present)."  OAR 291-105-0015(4)(a).

evidence sufficient to undermine Parker's decision.  *See Williams v. Thomas*, 492 F. App'x 732,

734 (9th Cir. 2012) (unpublished) (district and appellate court reviewed video evidence in order to

help determine whether it constituted exculpatory evidence).  To that end, I direct defendants to

provide a copy of the video by October 14, 2016.  Should I require additional briefing following

my review of the video, I will request it. Accordingly, summary judgment on this portion of

plaintiff's second claim as to Parker only is deferred.

 With respect to Parker's denial of plaintiff's request to call Britt as a witness, as I indicate

above, due process protections do include the ability of an inmate to call witnesses and present

"documentary evidence" in his defense when to do so would not be "unduly hazardous to

institutional safety or correctional goals."  *Wolff*, 418 U.S. at 566.  However, Parker gives legally

sufficient reasons for denying plaintiff's request, including institutional security risk, as well as

the irrelevant and repetitive nature of the testimony.  *See id.* at 567 (risk of reprisal and potential

for "havoc inside the prison walls"); Parker Decl. ¶ 5.

 Plaintiff argues Parker refused to investigate his charge that more than 300 inmates

received Neurontin.  Pl.'s First Aff. ¶ 78.  Plaintiff produces no evidence that he asked Parker to

investigate pursuant to administrative rule, or that Parker denied the investigation.  *See* OAR

291-105-0028(8).  In any event, the fact that 300 other inmates receive Neurontin is not a defense

to plaintiff's charge, nor is it a due process violation as a matter of law to deny such an

investigation.  *See Wolff*, 418 U.S. at 563-70 (explaining what due process requires); *Walker*, 14

F.3d at 1419-20 (failure to follow a rule does not constitute a due process violation).

 With regard to plaintiff's challenge to the administrative review, plaintiff merely

speculates Williamson did not review the case.  In any event, as I indicated above, there is no

constitutional right to have certain procedures used in an administrative appeal. *Ramirez*, 334 F.3d at 860.

Defendants Engle and Williamson are entitled to summary judgment and are dismissed with prejudice. As I explained above, pending my review of the video, I defer summary judgment on plaintiff's claim that Parker's decision was not supported by "some evidence."[5]

III.    Third Claim

Plaintiff alleges the following individuals were deliberately indifferent to his mental health care needs: Captain Long (Group Living), Barbara Miller (Psychiatric Mental Health Nurse Practitioner), Christin Farrell (Qualified Mental Health Professional), Todd Byerly (Behavioral Health Services supervisor), Jana Russell (BHS Administrator), Corrie Gordon (Qualified Mental Health Professional) and Peters.[6] I refer to all of these defendants (with the exception of Peters and Long) as the BHS defendants.

---

[5] Similarly, I defer defendants' alternative qualified immunity defense.

[6] Plaintiff also alleges a claim under the Americans with Disabilities Act–that he was deprived of mental health care. Compl. 50-51; *see also* Pl.'s Resp. 19, 21. Defendants do not address this claim. In order to state a claim, plaintiff must show: (1) he is a "qualified individual with a disability"; (2) he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by a public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability. *See* 42 U.S.C. § 12132. However, the "ADA prohibits discrimination because of disability, not inadequate treatment for disability." *Simmons v. Navajo Cty., Ariz.*, 609 F.3d 1011, 1022 (9th Cir. 2010). In any event, the appropriate test for intentional discrimination under the ADA is "deliberate indifference." *Duvall v. Cty. of Kitsap*, 260 F.3d 1124, 1138 (9th Cir. 2001). Assuming, without deciding, that plaintiff could meet the ADA factors, he fails to present evidence of deliberate indifference. *Lantis v. Marion Cty.*, No. 6:12-cv-00041-SI, 2014 WL 1910960, at *5 (D. Or. May 13, 2014).

A.    Relevant Facts

Plaintiff alleges he has suffered from a mental health disorder since he was a child, that he was convicted of aggravated murder and sentenced to death, but that his death sentence was overturned.  In a re-sentencing proceeding, his attorneys sought the assistance of a Yale psychiatry professor who opined plaintiff suffered from precocious puberty and attention deficit disorder with hyperactivity, and that plaintiff's "violent antisocial behavior was predestined[.]" Compl. Ex. 25, at 6.  Plaintiff obtained psychological treatment at OSP for diagnoses (as of 2001) of major depressive disorder, recurrent with a history of psychotic features, social phobia, methamphetamine dependence history, and antisocial personality disorder.

As of November 2011, plaintiff was taking Geodon and Prozac.  He met with Miller on November 22, 2011, reporting that he had stopped taking his Prozac two weeks before and that he felt "fine."  Miller Decl. Attach. 3, at 23.  He had a job and he had no issues with appetite, energy, or living in general population.  Miller noted plaintiff's stability, despite not taking his Prozac.  Miller discontinued the Prozac and directed him to return to her in four to five months, or "kyte" should he need assistance before then.

On June 24, 2012, plaintiff sent a kyte reporting he felt depressed, felt like crying, and was very sad.  He felt like someone was watching him, and he heard loud voices in his head.  The response indicated he was scheduled for an appointment on June 28, 2012 in DSU.  Plaintiff says Miller came to DSU and scheduled him for an appointment after July 2, 2012, when he was released from DSU.

Plaintiff saw Miller on July 3, 2012.[7]  At that time, plaintiff reported being disciplined after testing positive for marijuana.  He noted he was having "weird thoughts and anxiety. Thinking people are watching me."  Miller Decl. Attach. 3, at 21.  He appeared attentive, cooperative, alert, and talkative, and his thoughts were organized.  He had no suicide ideation, no issues with appetite or energy, and no issues living in the general population.  Miller suggested his feeling of being watched may be justified as ODOC may be monitoring his activities after his positive drug tests.  While he reported depression, Miller thought he appeared anxious instead. He was not taking anti-depressants.  Miller changed plaintiff's diagnosis from major depressive disorder to anxiety disorder not otherwise specified versus a social phobia.

When he sought a BHS counselor, Gordon informed him on October 16, 2012 that plaintiff no longer had an assigned case worker.  Miller confirmed that on October 23, 2012, explaining plaintiff no longer met the criteria for one.  Miller saw plaintiff on November 1, 2012, and no change was made to his diagnosis or medication.  When plaintiff kyted nine days later complaining of depression, stress, and panic, Miller responded that she had seen him on November 1 and that he did not have a case manager.  Pl.'s First Aff. Ex. 57.

Plaintiff sought assistance calling his sister collect, and complained of mental problems. Byerly responded on November 16, 2012 that plaintiff's diagnosis did not qualify him to receive BHS case management services.  He was to have his unit staff contact BHS if he experienced a mental health crisis.

---

[7]Plaintiff disputes that this meeting occurred.  Pl.'s First Aff. ¶¶ 87, 89.  However, it is indisputable that Miller's contemporaneously created chart note dated July 3, 2012 reflects her treatment of plaintiff on that date.

Plaintiff again saw Miller on March 28, 2013. No changes were made. On June 6, 2013, plaintiff complained of depression, and Gordon responded that he had been scheduled for an appointment. Gordon met with plaintiff on June 11; plaintiff said he had been depressed and anxious a few days ago but the symptoms had gone away. When he asked Gordon why he felt that way, Gordon said she could not answer that question. Plaintiff said, "I guess I will have to deal with it on my own" and walked out of the office. Miller Decl. ¶ 10. Gordon noted plaintiff was calm, cooperative and coherent.

Plaintiff received responses from BHS on July 22 and July 30, 2013 denying his request for earplugs while in DSU and declining to assist in reducing his disciplinary sanctions. Miller saw plaintiff again on September 3, 2013; he denied any mental health issues. On January 8, 2014, Miller examined plaintiff; he reported agitation and irritability but he had not "acted on it in 30 years[.]" Miller Decl. ¶ 14. No changes were made. Similarly on February 20, 2014, Miller reported "doing alright" and that the Geodon was working for him. Miller Decl. ¶ 15.

After living in a single cell,[8] plaintiff was placed in a double cell in March 2014 for four nights. Captain Long explains in his declaration that when plaintiff was released from DSU on March 6, 2014 and needed a cell in General Population, the captain noticed plaintiff had no documented need for a single cell.

Plaintiff was able to obtain a reassignment to a single cell because his recovery from heart bypass surgery required placement on the ground floor. When he learned from Captain Long that

---

[8] The exact number of years is unclear. Pl.'s First Aff. ¶ 122 (mental health single cell for 15 years); ¶ 124 (mental health single cell for 14 years); ¶ 146 (single cell for mental reasons from 1987 to 1997 and from 2001 to March 2014); ¶ 148 (mental health single cell status for 24 ½ years); Archdeacon Decl. ¶ 5 (plaintiff "in the last decade spent only four nights in a double cell").

his placement in a single cell was due only to this "no stairs" restriction, plaintiff expressed

concern about a future double cell assignment, saying the possibility of living in a double cell

caused stress and panic attacks and he might kill himself.  He wrote, "I've let my sister know

what is going on here with the lack of accurate mental health CTS single cell status that's not on

my file after 15 years."  Pl.'s First Aff. Ex. 60.  Gordon responded on March 11, 2014 that

plaintiff's "mental health [diagnosis] does not give you a mental health specialist.  If you are

having increased symptoms please address them with your prescriber.  Your[ sic] do not meet

criteria for a single cell from BHS.  Please note a kyte like this could get you a misconduct report

for extortion."  *Id.*

When plaintiff contacted Miller on March 12, 2014, she responded that she did not

authorize single cells and directed him to talk with group living.  Plaintiff saw Miller on March

25, 2014, who "continues to endorse stability with Geodon and does not wish to stop medication

at this time."  Miller Decl. Attach. 3, at 16.  On March 28, 2014, in response to plaintiff's

grievance about his cell, Gordon and Byerly explained BHS "did not remove any single cell

housing assignment nor can BHS place a single cell status on the ODOC computer system.  You

do not currently meet criteria for the diagnosis you listed on your grievance.  You have not had

the diagnosis you mentioned since July 3, 2012.  Your diagnosis has been updated to reflect your

current symptoms.  You are currently being seen for medication management by a BHS

prescriber."  Pl.'s First Aff. Ex. 80.

Plaintiff complained that his symptoms would increase with a double cell.  On March 31,

2014, Byerly told plaintiff he did not have an assigned case manager through BHS, that Miller

was his prescriber, that he did not meet the criteria for a single cell and that he could request one through group living.

On April 8, 2014, Russell reported that she had reviewed the records, conferred with Captain Long, and confirmed plaintiff was currently living in a single cell. She explained, "Your current diagnosis and symptoms do not indicate a need for BHS staff to intervene on your housing assignment. I would encourage you to work with the Group Living staff to address your desire to live in a single cell." Miller Decl. Attach. 2, at 4.

Two days later, Miller examined plaintiff, who reported feeling stressed and depressed because he lost his single cell status, and that he could not live in a double cell because he would fight or flee in a close environment. When Miller explained that BHS criteria for a single cell had changed over the years and that he did not meet the current criteria, he became angry and left the appointment saying, "If I kill someone well that will be ok." Miller Decl., Attach. 3, at 13. Miller reviewed and summarized his chart from 1991 to the present. She noted that since 2004, plaintiff's symptoms about voices and mood problems had been vague, he requested medications like Klonopin and Wellbutrin that are regularly abused in the prison system, and he did not display any signs of a psychotic disorder. She noted his audio hallucinations were atypical as he reported hearing them all the time. She continued to diagnose anxiety disorder, not otherwise specified, rule out substance induced; social phobia; history of meth dependence; and cannabis abuse.

Plaintiff kyted Miller that "after their meeting today" he wanted to note his single cell was part of his treatment plan. Miller responded that he was currently in a single cell.

Plaintiff sent a letter to Peters complaining about the loss of his single cell and Premo responded on her behalf explaining, "Your single cell status was removed by Behavior Health Services. I recommend that if you feel you have a need for a single cell due to BHS concerns, you contact a BHS professional." Pl.'s First Aff. Ex. 81.

Plaintiff continued to investigate who had changed his diagnosis and why. In July, on two occasions Miller responded to plaintiff that the person who changed his diagnosis no longer worked for ODOC, but that she could refer plaintiff for testing if he believed his diagnosis was wrong. *Id.*, Exs. 67, 68. She then met with him on July 31, 2014. Plaintiff expressed frustration with being disciplined for passing a piece of paper to another inmate, and for the change in diagnosis. He asked for an increase in his Geodon to help with the voices in his head and his paranoia. He was not suicidal. Miller offered him an SSRI, which he declined finding it hard to swallow pills (even though he was on five medications in pill form). Miller noted he was "vested in having a higher BHS MH code and may be feigning symptoms." Miller Decl. Attach. 3, at 11. She restarted Prozac.

Plaintiff continued to complain that he believed his mental health problems were life-long and wanted to know why he no longer qualified for a single cell. Miller and Byerly responded on August 7, 2014 that plaintiff's diagnosis "was changed on 7-3-1[2] after a discussion and review of your symptoms by your previous Mental Health Specialist and myself. I met with you on 7/31/14 and informed you if you did not agree with current diagnosis you could be referred to Psychiatric testing to which you agreed. You have been referred and are on the list." Pl.'s First Aff. Ex. 70.

Page 23 - OPINION AND ORDER

In response to his inmate communication, Russell responded on September 4, 2014, "I have reviewed the inmate communication you sent, your mental health record, and conferred with the BHS professionals responsible for your assessment, diagnosis, and treatment. I understand your diagnosis was changed over an eighteen month process of evaluating your symptoms. Please know this is a lengthy process which the mental health treatment providers take seriously. The providers observe your symptoms over time prior to making any changes to ensure your observed symptoms are consistent with the change." *Id.*, Ex. 72.

At his appointment with Miller on September 17, 2014, he denied suicide ideation, he reported periods of difficulty with loud noises, and he reported agitation and irritability. Miller offered an increase in Prozac, which he declined.

Plaintiff contends he saw Miller every six months for five to ten minutes. She asked about medications only. When plaintiff "tried to discuss his mental health symptoms of suicidal thoughts, depression, hearing voices in head, seeing things watching him and following him and high stress, panic attacks with paranoia schizophrenia symptoms," Miller told him she was not his case worker. Pl.'s First Aff. ¶ 85.

Plaintiff continued to seek the name of the person, along with Miller, who had "downgraded" his diagnosis. On October 2, 2014, Russell finally responded that plaintiff's diagnosis had been changed on July 3, 2012 by Miller and Christin Farrell, a Qualified Mental Health Professional. Russell underscored that BHS would not be recommending single cell housing for plaintiff. Plaintiff remembered meeting with Farrell three to four times a year for five or ten minutes only. He believes Farrell ignored his symptoms and "feigned" concern. Pl.'s First Aff. ¶ 84.

Page 24 - OPINION AND ORDER

Plaintiff's diagnosis was changed to adjustment disorder by Lyle Kinikini, M.D., while plaintiff was housed at Snake River Correctional Institution (SRCI) in March 2015.

Plaintiff filed this lawsuit on April 13, 2015 contending, among other things, that Miller and Farrell "deliberately misdiagnosed plaintiff" to "deprive plaintiff of BHS benefits, programs, activities and services." Pl.'s First Aff. ¶ 107.

Premo, again responding to a letter plaintiff sent to Peters, explained:

> In reviewing your file, I find no order for a placement in a single cell due to mental health by any Behavioral Health Services staff. I have noted that on a few occasions, you have been assigned to a single cell during your tenure at the Oregon State Penitentiary. The current restrictions on your record are being honored as noted by your current housing assignment. If you believe you are entitled to a single cell, please contact the BHS provider asking them to review your case. It is the intention of the Penitentiary to ensure that all inmates receive appropriate housing.

Pl.'s First Aff. Ex. 84.

Plaintiff was examined on November 25, 2015 by Donald Dravis, M.D., who also diagnosed adjustment disorder. He thought plaintiff's description of paranoid thinking might be social anxiety. The doctor increased the Prozac dosage.

B.    Peters and Captain Long

Plaintiff fails to allege or provide evidence demonstrating Captain Long's involvement in plaintiff's mental health care. Accordingly, this claim is dismissed as to Captain Long.

Plaintiff generally alleges Peters failed to take "corrective action" to address the "deliberate indifference for plaintiff's mental health needs[.]" Compl. 33, ¶ 86. He alleges Peters knew about the issues he raised via "a separate administrative review process." *Id.*

Page 25 - OPINION AND ORDER

Defendants argue Peters cannot be liable as a supervisor under section 1983. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). In the Ninth Circuit, however, "a prison administrator can be liable for deliberate indifference to a prisoner's medical needs if he 'knowingly fail[s] to respond to an inmate's requests for help." *Peralta v. Dillard*, 744 F.3d 1076, 1086 (9th Cir. 2014) (en banc) (quoting *Jett v. Penner*, 439 F.3d 1091, 1098 (9th Cir. 2006)).

Thus, plaintiff must show Peters was involved in the decision to deny the mental health care plaintiff requested or that she had control over the medical care given to plaintiff, and knew of an excessive risk to plaintiff's health caused by the denial of such care. *See Toguchi v. Chung*, 391 F.3d 1051, 1057-58 (9th Cir. 2004) (prison official is deliberately indifferent if knows of and disregards an excessive risk to inmate's health); *Starr v. Baca*, 652 F.3d 1202, 1207-08 (9th Cir. 2011) ("The requisite causal connection can be established by setting in motion a series of acts by others, or by knowingly refusing to terminate a series of acts by others, which the supervisor knew or should have known would cause others to inflict a constitutional injury." (citation, quotation marks, and internal alterations omitted)).

Plaintiff simply fails to meet this standard. On the occasions when plaintiff contacted Peters via letter, she referred the matter to others in the ODOC. Plaintiff produces no evidence that Peters knew or should have known anyone showed deliberate indifference to plaintiff's mental health needs. *See* Pl.'s First Aff. ¶ 138 (asserting only that as the director, Peters should be ensuring the health and safety of prisoners, and citing to Exhibit 50 for the proposition that plaintiff was once entitled to a single cell). There is no evidence Peters knew about and knowingly failed to respond to plaintiff's requests for help. She is entitled to summary judgment.

Page 26 - OPINION AND ORDER

C.    <u>Deliberate Indifference</u>

The treatment a prisoner receives in prison and the conditions of his confinement are

subject to scrutiny under the Eighth Amendment. *Helling v. McKinney*, 509 U.S. 25, 31 (1993).

As the Supreme Court has explained,

> The [Eighth] Amendment also imposes duties on these officials, who must
> provide humane conditions of confinement; prison officials must ensure that
> inmates receive adequate food, clothing, shelter, and medical care, and must take
> reasonable measures to guarantee the safety of the inmates[.]

*Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (internal citations and quotations omitted).  A

prison official violates a prisoner's Eighth Amendment rights only when the claim satisfies both

an objective and subjective inquiry. *Lopez v. Smith*, 203 F.3d 1122, 1132-33 (9th Cir. 2000).

Defendants do not argue that the objective element of the Eighth Amendment inquiry is

not met–that element seeks to determine whether the deprivation was sufficiently serious.

*Wilson v. Seiter*, 501 U.S. 294, 298 (1991).

The subjective inquiry requires a showing that corrections officers acted with deliberate

indifference to plaintiff's serious medical need. *Lopez*, 203 F.3d at 1132.  "[A] prison official

cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of

confinement unless the official knows of and disregards an excessive risk to inmate health or

safety . . . ." *Farmer*, 511 U.S. at 837.  A difference of opinion as to the specific course of

treatment does not establish deliberate indifference. *Wilhelm v. Rotman*, 680 F.3d 1113, 1122

(9th Cir. 2012).  Instead, plaintiff "must show that the course of treatment [defendants] chose was

medically unacceptable under the circumstances, and [he] must show that [defendants] chose this

course in conscious disregard of an excessive risk to plaintiff's health." *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (internal citations omitted).

Plaintiff alleges the BHS defendants acted with deliberate indifference toward his mental health needs and failed to accommodate his needs by double celling him.  He alleges the BHS defendants provided inadequate mental health care, delayed treatment, deliberately misdiagnosed him,[9] and warned him that he could face a misconduct report for discussing his symptoms in a kyte.  Plaintiff points to the infrequent meetings with Farrell and Miller, the short appointment times, that his diagnosis was changed based only on a chart review, that the severity of his mental health history belies the mild diagnosis, that he was prescribed Geodon and Prozac, and his subjective feeling both providers ignored his symptoms.

Defendants have established an absence of evidence to support plaintiff's deliberate indifference claim, based on Miller's declaration as well as plaintiff's mental health records.  It is plaintiff's burden "to designate specific facts demonstrating the existence of genuine issues for trial." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010).  Plaintiff "must show more than the mere existence of a scintilla of evidence," and he "must do more than show there is some 'metaphysical doubt' as to the material facts at issue." *Id.*  Plaintiff must identify evidence from which a jury could reasonably conclude he is entitled to a verdict in his favor.

Plaintiff fails to raise a genuine issue of material fact for trial showing the BHS defendants were deliberately indifferent to his mental health needs when they changed his diagnosis.  To the contrary, while he had previously been diagnosed with major depressive

---

[9] I decline to address defendants' argument that plaintiff's claim against Farrell and his challenge to the changed diagnosis are beyond the two-year statute of limitations applicable to claims brought pursuant to Section 1983.

disorder, recurrent with a history of psychotic features, social phobia, methamphetamine

dependence history, and antisocial personality disorder, as of November 2011 he was no longer

taking Prozac and he was feeling fine.  When he met with Miller on July 3, 2012, he was

attentive, cooperative, alert, talkative, with organized thoughts.  He had no suicide ideation, no

issues with appetite or energy and no issues living in the general population.  In response to his

concerns about anxiety and thinking people were watching him, Miller noted his feeling may be

justified since his positive drug tests would increase monitoring.  He was stable off of anti-

depressant medications.  Miller changed his diagnosis from major depressive disorder to anxiety

disorder not otherwise specified versus a social phobia.  The change in diagnosis meant he no

longer qualified for BHS services.  At some point, he also no longer met the BHS criteria for a

single cell.

Looking at the facts in plaintiff's favor, Miller was not forthcoming about who made the

diagnosis change when plaintiff asked about it.  In July 2014, she twice told plaintiff the person

who made the diagnosis change no longer worked at ODOC.  A month later, Miller said she had

made the change, along with the previous mental health specialist.  In October 2014, Russell

informed plaintiff that the change had been made by Miller and Farrell.  Even accepting that

Miller was hiding information about who changed plaintiff's diagnosis, there is no evidence she

changed plaintiff's diagnosis out of deliberate indifference to his mental health care needs.  As

Russell explained to plaintiff, his diagnosis was changed "over an eighteen month process of

evaluating your symptoms."  Pl.'s First Aff. Ex. 72.  Indeed, two different medical providers

have subsequently diagnosed plaintiff with adjustment disorder, further suggesting the previous

diagnosis of major depressive disorder with psychotic features was no longer supported.  Miller

Decl. Attach. 3, at 6, 8.  In short, there is no evidence that the new diagnosis was "medically unacceptable."  *See Toguchi*, 391 F.3d at 1958 (difference of opinion not deliberately indifferent); *Reuther v. Fickle*, No. 2:11-cv-01449-PK, 2014 WL 3858392, *12-13 (D. Or. Aug. 5, 2014) (agreement among doctors as to diagnosis suggests challenged diagnosis was not "medically unacceptable").

Plaintiff complains of inadequate and delayed mental health care but he fails to raise a genuine issue of material fact demonstrating the inadequacy of the care.  The record reflects every time he complained of increased symptoms, he had an opportunity to talk with Miller (11/22/11; 7/3/2012; 11/1/12; 3/28/13; 9/3/13; 1/8/14; 2/20/14; 3/25/14; 4/10/14; 7/31/14; 9/17/14), Gordon (6/6/13), Dr. Kinikini (3/29/15), or Dr. Dravis (11/25/15).  In the interim, he was invited to kyte or have his unit staff contact BHS if he experienced a mental health crisis.

Plaintiff asserts he was scared to talk about his symptoms once he received Gordon's misconduct warning for saying he might kill himself over the possibility of living in a double cell.  Pl.'s First Aff. Ex. 60.  Plaintiff also contends on a handful of occasions Miller offered a safe cell to him.  Plaintiff's evidence flatly contradicts his assertion of fear.  He was comfortable enough with Miller to tell her a month after Gordon's misconduct warning that he would kill someone if ODOC housed him with another person, that he heard voices all the time, and that he was depressed and stressed as a result of losing his single cell status.  Miller Decl. Attach. 3, at 13; *see also* Attach. 3, at 11 (7/31/2014 appointment in which plaintiff reported wanting to kill people); Attach. 3, at 10 (9/17/14 appointment in which plaintiff reported periods of wanting to "bash their heads in"); Attach. 3, at 6 (11/25/15 appointment in which plaintiff noted thoughts about harming other people "all the time").  Notably, he always exercised self-control.

Finally, defendants gave plaintiff conflicting information about who was responsible for plaintiff no longer qualifying for a single cell. Regardless, the clear message plaintiff received was that he no longer qualified for one. Gordon explained to plaintiff on March 11, 2014, that he did "not meet criteria for a single cell from BHS." Pl.'s First Aff. Ex. 60. Gordon and Byerly explained in response to plaintiff's grievance that BHS had not removed the single cell status, but in any event he no longer met the criteria for the diagnosis he listed. Several days later, Byerly repeated for plaintiff that he did not meet the criteria for a single cell. Russell reiterated that BHS would not be recommending single cell housing for plaintiff on October 2, 2014.

Miller consistently informed plaintiff that she did not assign single cells. As she indicates in her declaration,

> As a PMHNP, I do not order single cells. BHS does not assign cells but may on occasion recommend housing to security if a client is showing objective signs of severe disturbance but a diagnosis of Major depression would not be the sole criteria. Inmate Farrar did not show any objective evidence that he could not be doubled [sic] celled. He has made statements that he could or might assault someone or kill himself but displayed no actual physical evidence in years and he is taking medication designed to treat those symptoms.

Miller Decl. ¶ 5.

In sum, plaintiff's evidence is insufficient to survive summary judgment. This claim is dismissed.

IV.    <u>Fourth Claim</u>

In his fourth claim, plaintiff alleges Captain Long retaliated against him for exercising his constitutional right to mental health care, having a single cell status, and accessing other program, services and activities. He also alleges Captain Long acted with deliberate indifference in housing plaintiff.

Page 31 - OPINION AND ORDER

A.    Relevant Facts

At least as of 2009, someone had ordered a single cell for plaintiff.  Pl.'s First Aff. Ex. 50 (purporting to be computer print-out from 3/6/2009 showing "Young" ordered a single cell).  However, plaintiff was placed in a double cell on March 6, 2014.  Plaintiff was able to obtain a single cell again on March 10, 2014 because he had recently undergone heart bypass surgery and needed ground floor housing.  When plaintiff complained in a kyte to Captain Long about his four nights in a double cell, Captain Long responded, "You got a single cell only because of your no stairs restriction.  You will return to a double cell when the restriction expires.  You can get a single cell legitimately only after you meet our criteria."  Pl.'s First Aff. Ex. 79.  Plaintiff asserts that once he received the "no stairs" restriction, Captain Long assigned plaintiff to the "worse [sic] living conditions in OSP D-Block-151 in front of the barbershop and on the bar box."  Pl.'s First Aff. ¶ 152.  Plaintiff insists Captain Long placed him in a double cell due to "malice intent and discrimination."  *Id.* ¶ 147.

Captain Long explains that when plaintiff was released from DSU on March 6, he needed to be placed in general population.  Captain Long noticed that plaintiff did not have a "documented need for a single cell."  Long Decl. ¶ 3.  Captain Long followed OAR 291-077-0010 *et. seq.* in assigning plaintiff to a double cell; a single cell is an incentive for good behavior for most inmates.

 Captain Long testifies that once plaintiff no longer qualified for the no stairs order, he placed plaintiff in "a cell which best fit the security and administrative needs of the institution."  Long Decl. ¶ 5.  He assigned the new cell just as he would for any other inmate and did not do so with "any malice or retaliation."  *Id.* ¶¶ 6,7.

Page 32 - OPINION AND ORDER

Plaintiff asserts other inmates were never assigned a cell in front of the barbershop or near the bar box.  Pl.'s First Aff. ¶¶ 188-190.  He questions the various responses he received from officials, particularly Premo's assertion that BHS removed the single cell status in May 2014 when just two months earlier BHS staff informed plaintiff it did not remove any single cell housing assignment.  Pl.'s First Aff. Exs. 90 and 88.

B.    <u>Retaliation</u>

A First Amendment retaliation claim requires plaintiff to show (1) he engaged in a protected action; (2) defendants took adverse action against him; (3) a connection exists between the protected conduct and the adverse action; (4) the adverse action chilled the plaintiff's exercise of his First Amendment rights or otherwise harmed him, and (5) there was no legitimate penological reason for the adverse action.  *Brodheim*, 584 F.3d at 1269.  To show a connection between any protected conduct and the alleged adverse action, plaintiff must demonstrate that "the 'substantial' or 'motivating' factor behind the [defendants'] conduct" was the fact that plaintiff engaged in protected conduct.  *Id.* at 1271 (quoting *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1989)); *see also Ford v. City of Yakima*, 706 F.3d 1188, 1193 (9th Cir. 2013) (per curiam) (must have evidence that "desire to chill [plaintiff's] speech was a but-for cause of . . . allegedly unlawful conduct").  Accordingly, plaintiff must "'put forth evidence of retaliatory motive, that, taken in the light most favorable to him, presents a genuine issue of material fact as to [defendants'] intent'" in taking the adverse action.  *Brodheim*, 584 F.3d at 1271 (quoting *Bruce*, 351 F.3d at 1289).

Plaintiff gives varying hypotheses for Captain Long's initial decision to house him in a double cell, including anger at plaintiff's mental health single cell status and wanting to punish plaintiff for smoking marijuana.

First, plaintiff asserts it was "common knowledge" he had previously been placed in a single cell for mental health reasons, Pl.'s First Aff. ¶¶ 145, 146, Ex. 50, and that Captain Long was angry plaintiff could be placed in a single cell without meeting the clear conduct criteria. Pl.'s First Aff. ¶¶ 147, 152, 161; Exs. 78, 79. There is no evidence of any connection between any protected conduct and the adverse action, however. Even assuming Captain Long knew plaintiff previously qualified for a single cell due to his mental health, the evidence reflects mental health care providers changed plaintiff's diagnosis in July 2012, which Captain Long had nothing to do with. As a result, Gordon explained to plaintiff on March 11, 2014, that he did "not meet criteria for a single cell from BHS." Pl.'s First Aff. Ex. 60. Gordon and Byerly explained in response to plaintiff's grievance that BHS had not removed the single cell status, but in any event he no longer met criteria for the diagnosis he listed. Several days later, Byerly repeated for plaintiff that he did not meet the criteria for a single cell. Russell reiterated that BHS would not be recommending single cell housing for plaintiff on October 2, 2014.

Plaintiff also alleges Captain Long put him in a double cell as punishment for smoking marijuana. Pl.'s First Aff. ¶ 165, Ex. 79 (plaintiff complained to Premo that officer housed him in a double cell for smoking pot); Compl. 23, ¶ 53; 34, 89 (plaintiff talked with other OSP officers and learned Captain Long did not like that plaintiff smoked marijuana). Smoking marijuana is not protected conduct. *Pell v. Procunier*, 417 U.S. 817, 822 (1974) (prisoners have

First Amendment rights "that are not inconsistent with [their] status as [] prisoner[s] or with the legitimate penological objectives of the corrections system").

With respect to Captain Long's placement of plaintiff in D-151, which plaintiff says is one of the noisiest and worst cells in D-block, plaintiff asserts Captain Long retaliated against plaintiff for having obtained a no stairs medical restriction from Dr. Degner. Pl.'s First Aff. ¶¶ 152, 168. Plaintiff's kyte to Dr. Degner seeking medical care after his heart surgery is protected conduct.

Here, defendants have established an absence of evidence to support plaintiff's retaliation claim–Captain Long asserts that he treated plaintiff the same as any other inmate. As a result, the burden–which is "not a light one"–shifts to plaintiff "to designate specific facts demonstrating the existence of genuine issues for trial." *In re Oracle Corp. Sec. Litig.*, 627 F.3d at 387. Assuming plaintiff raises a genuine issue of material fact that placement of plaintiff in a noisy cell is an "adverse action," plaintiff has not produced evidence to support his supposition that plaintiff's protected conduct was a substantial or motivating factor for Captain Long's housing choice.

Courts recognize that rarely is there direct evidence of intent. Circumstantial evidence may suffice if it is evidence of motive. Such evidence typically falls into one of three categories: "'(1) proximity in time between protected speech and the alleged retaliation; (2) [that] the [defendant] expressed opposition to the speech; [or] (3) other evidence that the reasons proffered by the [defendant] for the adverse . . . action were false and pretextual.'" *McCollum v. Cal. Dep't of Corr. & Rehab.*, 647 F.3d 870, 882 (9th Cir. 2011) (quoting *Allen v. Iranon*, 283 F.3d 1070, 1077 (9th Cir. 2002)).

Plaintiff points to the timing of Captain Long's decision to place him in D-151 immediately after having received the no stairs medical restriction.  However, timing alone is insufficient; there must be additional evidence to support an inference of retaliatory motive or intent.  *Pratt v. Rowland*, 65 F.3d 802, 808 (9th Cir. 1995).

Plaintiff states that he "only knew of one person that got out of DSU for a contraband charge that lived on one bar 152 for 25 to 30 days in front of the barbarshop [sic], then was moved to better living conditions[.]"  Pl.'s First Aff. ¶ 172.  The exhibits to which he cites do not support his assertion.  *See id.* Exs. 63, 64, 80, 81, and 86.  There is no evidence Captain Long was motivated to retaliate against plaintiff for his obtaining a no stairs restriction.

Plaintiff asserts Captain Long placed him in D-153 to punish plaintiff for his complaints about being housed in a double cell.  There is no dispute that plaintiff's kytes and grievances complaining about being double celled, and complaining about his placement in D-151 and D-153 are protected conduct.  *Valandingham v. Bojorquez*, 866 F.2d 1135, 1138 (9th Cir. 1989).  Again, assuming plaintiff raises a genuine issue of material fact that placement in a noisy cell is an adverse action, plaintiff presents only conclusory allegations that Captain Long placed plaintiff in a noisy cell in retaliation for those grievances and kytes.  Plaintiff contends his single cell status "disappeared on Capt. D. Long's watch" but the evidence demonstrates BHS repeatedly indicated he failed to qualify for a single cell.  Importantly, BHS staff declined to intervene on his behalf.  Plaintiff offers affidavits from three inmates saying they were never assigned to the cells in front of the barber shop.  I accept that these three inmates were never housed in D-151 or D-153.  However, their declarations are too general; they give no indication who was responsible for their housing assignment and no history about their involvement with

the grievance system.  Further, the fact that Captain Long did not retaliate against them does not mean Captain Long did retaliate against plaintiff.  In short, there is no evidence other than the timing and that other inmates never had to be housed in front of the barbershop to support plaintiff's supposition that Captain Long wished to punish plaintiff.

Finally, it is plaintiff's burden to prove the absence of legitimate correctional goals for Captain Long's conduct.  Plaintiff offers no factual support to dispute Captain Long's statement that he put plaintiff in a cell "which best fit the security and administrative needs of the institution."  Long Decl. ¶ 5.  Indeed, in responding to plaintiff's requests to be moved, Captain Long repeatedly urged plaintiff to improve his conduct in order to qualify for a move.  Pl.'s First Aff. Ex. 96, 98 (mentioning contraband charges).

Plaintiff fails to identify evidence from which a jury could reasonably conclude he is entitled to a verdict in his favor.

C.    Deliberate Indifference

Plaintiff alleges Captain Long removed his mental health single cell status from the OSP computer system and was deliberately indifferent to plaintiff's mental health needs by placing him in a double cell.

As an initial matter, as I indicated at length above, it appears at some point plaintiff qualified for a single cell as a result of his mental health; however, that diagnosis changed in July of 2012.  As a result, plaintiff no longer qualified for BHS counseling services and he did not meet the criteria for BHS to recommend a single cell on his behalf.  While there is factual inconsistency in ODOC officials' responses to plaintiff about how he no longer qualified for a

single cell as a result of his mental health status, there is simply no evidence Captain Long had anything to do with the change.

The next question is whether Captain Long knew or should have inferred that plaintiff's safety or mental health was threatened if he were double celled. *Farmer*, 511 U.S. at 837 ("prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety.").

On this issue, plaintiff asserts (1) he was housed in a single cell for the majority of his time in prison; (2) Captain Long told plaintiff he needed to meet the incentive criteria to earn a single cell, Pl.'s First Aff. Ex. 79; (3) plaintiff always returned to a single cell after serving DSU sanctions; (4) at least as of March 2009, the computer reflected he was entitled to a single cell; and (5) officials provided Captain Long with courtesy copies of letters in which they (a) incorrectly summarized plaintiff's housing history, (b) denied the existence of a single cell restriction due to mental health concerns, and (c) contradicted BHS by reporting BHS removed the single cell status, *id.* Ex. 85, 81.

Viewing these facts in the light most favorable to plaintiff, defendants gave plaintiff inconsistent and incorrect information about (1) his housing history; (2) how he could obtain a single cell; (3) and who he needed to speak with about obtaining one.

Nevertheless, the undisputed evidence also demonstrates:  (1) at the time Captain Long housed plaintiff in a single cell, plaintiff did not carry a mental health diagnosis warranting a single cell; and (2) plaintiff had not earned a single cell.  Thus, while the evidence demonstrates plaintiff was eligible for a single cell sometime before May 6, 2014, the evidence also

demonstrates he did not remain eligible.  There is no evidence Captain Long knew plaintiff faced a substantial risk of serious harm by placing plaintiff in a double cell and disregarded that risk by failing to take reasonable measures to correct it.

With respect to plaintiff's allegation that Captain Long placed plaintiff in single cells (D-151 and D-153) that were noisy, knowing that such a placement would negatively impact his mental health, plaintiff produces the following evidence:

(1) two kytes dated October 1, 2014.  In the first, plaintiff asked to be moved from D-153 to E-138 or E-177 due to  noisy and disrespectful people.  Pl.'s First Aff. Ex. 97.  Captain Long denied his request.  In the second, plaintiff asked to be moved to D-159 when the inmate in there left.  He stated he would be less depressed and less stressed in that cell.  Captain Long told plaintiff to get "to level 2 and this move will be considered."  *Id.* Ex. 96.

(2) a kyte on October 6, 2014 asking to be moved to D-159, complaining of the noise, people looking into his cell, and bright lights.  Captain Long explained that due to plaintiff's contraband charges, he would not be moved until he reached level 2.  *Id.* Ex. 98.

(3) a cell assignment request dated October 7, 2014 asking to be reassigned due to noise, lack of privacy, other cells being less stressful, and that he could help out inmates Tim and Walt.  The request was denied on October 8, 2014 with the explanation, "Captain Long has indicated that you are to remain where you are."  *Id.* Ex. 99.

Although plaintiff's medical records reflect mental health stability (and anger over losing his single cell), I accept plaintiff's contemporaneous written reports to BHS of increased stress and depression.  Notably, however, plaintiff did not inform *Captain Long* about any increase in his mental health symptoms as a result of being placed in the noisy cells.  Since plaintiff has

failed to produce evidence Captain Long knew plaintiff was suffering an increase in his mental health symptoms as a result of his cell placement, plaintiff fails to identify specific facts demonstrating the existence of genuine issues for trial on the issue of Captain Long's deliberate indifference to plaintiff's mental health.

For the foregoing reasons, Captain Long is dismissed with prejudice.  As a result, defendants' alternative motion for partial summary judgment on the basis of exhaustion is denied as moot.

V.    Fifth Claim

In his fifth claim, plaintiff alleges S. Shelton, M.D. (ODOC Medical Director) and Carrie Coffey (OSP health services manager) were deliberately indifferent to his sciatic nerve pain and that they failed to provide adequate pain relief.  Compl. 54.

In his Supplemental Complaint, plaintiff alleges Dr. Shelton and Garth Gulick, M.D. (ODOC physician) were deliberately indifferent to his sciatic nerve pain and denied him adequate and timely medical care.

A.    Relevant Facts

To address his back pain, plaintiff received an extra mattress, was prescribed Neurontin (until plaintiff reported he was getting only minimal benefit from it in November 2011), and was doing well as of October 2012 without the Neurontin.  When plaintiff again complained about low back pain in July 2013, Dr. Degner again prescribed Neurontin, which plaintiff took until March 18, 2015.  Plaintiff's back had also been x-rayed in November 2013, which an outside doctor, Anthony Pappas, M.D., compared to a June 2011 x-ray.  Dr. Pappas found evidence of degenerative disc disease that was essentially unchanged from 2011.  Plaintiff saw medical

Page 40 - OPINION AND ORDER

providers for other problems from November 2013 until May 2014, but did not complain about

any back pain during that time.  In June 2014, after plaintiff complained of pain in his right hip,

he was told to stretch and walk, and he was given a no stairs restriction.  Later that month, he

expressed concern about side-effects of Naproxen, and a few days later he complained about

sciatica.  Dr. Degner met with plaintiff on August 1, who noted plaintiff was "doing well" and

they discussed his exercise program.  Plaintiff again qualified for an extra blanket and pillow in

late August 2014.

Beginning in September 2014, plaintiff began complaining about uncontrolled sciatic

pain.  He was scheduled to see a doctor on October 1.  The chart notes reflect the provider had a

"long discussion" with plaintiff about his options and that plaintiff requested a cortisone

injection.  Gulick Decl. Attach. 1, at 11.  Plaintiff then received a cortisone injection.[10]  On

November 20, nursing staff told plaintiff he could use Tylenol rather than other anti-

inflammatory medications if he was concerned about abdominal pain.  Security staff saw plaintiff

doing handstands in his cell.

Dr. Shelton informed plaintiff in a November 23, 2014 response to plaintiff's grievance

that the doctor agreed with others that it was "not the standard of practice to prescribe narcotic

pain management for chronic or neurologic pain."  Pl.'s Second Aff. Ex. 46.

On November 28, 2014, plaintiff complained about severe sciatic pain for the last six

weeks, and he requested another cortisone shot.  Plaintiff reported to the infirmary complaining

about abdominal pain the next day.  The nurse observed him in the infirmary for a few hours to

---

[10] When he received another cortisone injection in September 2015, plaintiff conceded
that the injection "helped a little in 2014."  Gulick Decl. Attach. 1, at 139.

watch for worsening symptoms before he was sent back to DSU.  Plaintiff then had several

appointments in December with Nurse Amy Mann, which were the subject of a previous lawsuit

filed by plaintiff, during which plaintiff complained about abdominal pain.  *Farrar v. Peters*,

6:15-cv-952-KI (D. Or. June 3, 2016) (12/4/14 and 12/18/14 appointments).

In January, plaintiff complained about breathing problems and abdominal pain, and Nurse

Mann's care.  Nurse Mann's examination of plaintiff on January 22, 2015 for abdominal pain

revealed normal findings.  *Id.*

ODOC transferred plaintiff to SRCI at the end of February 2015.  Immediately upon

arriving, he requested renewal of his medications, including Neurontin.  Pl.'s Second Aff. Ex. 55.

Plaintiff received an answer indicating a chart review had been scheduled.

On March 2, 2015, plaintiff complained to nursing staff about nerve pain, as well as

abdominal pain.  For the nerve pain, the nurse noted "he will need to see the Dr. for that

problem."  Gulick Attach. 1, at 7.  He was scheduled to see Dr. Gulick on March 10, 2015.

On March 3, 2015, Dr. Gulick reviewed plaintiff's chart.  The doctor's chart note is

almost indecipherable and he does not discuss it in his declaration.  It appears he ordered plaintiff

to wean off the Neurontin.  *Id.*  When plaintiff complained via kyte that he was not getting his

Neurontin, he was told he had been scheduled to see a provider.  He filed a grievance on March

6, 2015, complaining about the decision to discontinue his Neurontin prescription.

Dr. Gulick testifies that "ODOC nursing staff wrote in Inmate Farrar's medical chart that

he was a no-show for sick call" on March 9, and cites to his Attachment 1, page 7 to support his

statement; the chart note to which he refers does not reflect this information.

Plaintiff asserts that he met with Dr. Gulick on March 10, 2015.  Pl.'s Second Aff. ¶ 76.

He says Dr. Gulick told him that due to his prior contraband charges in May and October 2014,

he would not prescribe any pain medications.  *See also* Ex. 64 (grievance complaining Dr. Gulick

would not prescribe pain medications due to plaintiff's contraband charges); Ex. 85 (plaintiff's

kyte repeating that Dr. Gulick discontinued the Neurontin prescription because of plaintiff's

contraband charges).  Dr. Gulick concluded, based on his review of plaintiff's medical records

and x-rays only, that plaintiff did not have sciatica.[11]

In response to plaintiff's grievance about the discontinued Neurontin prescription, he was

told Dr. Gulick "has evaluated your current medical condition.  Based upon the most recent

exam, he did not believe that prescribing Neurontin was an appropriate medication for you."

Pl.'s Second Aff. Ex. 59.

Plaintiff had a face-to-face meeting with Robert White, RN, the nurse manager at SRCI

on April 24, 2015.  They discussed plaintiff's access to NSAIDS and ibuprofen, but that other

medications, including cortisone injections, would have to be approved by Dr. Gulick.  Nurse

White told plaintiff he could kyte Nurse White in the future.

Dr. Shelton responded to several of plaintiff's grievance appeals on May 8, 2015.  He

reported that he had reviewed the medical file, agreed plaintiff had been prescribed Neurontin in

the past, but that Dr. Gulick felt it was not needed and had discontinued it.  Dr. Shelton urged

plaintiff to address his concerns with Dr. Gulick.  Pl.'s Second Aff. Exs. 61, 67.

---

[11] Dr. Gulick does not discuss this appointment in his declaration and does not submit any medical records that support it occurred.  Plaintiff elsewhere indicates the appointment took place on 3/17/2015.  Pl.'s Second Aff. Exs. 64, 70.  The medical records submitted by Dr. Gulick in this case jump from his 3/3/2015 chart review to the 4/24/15 face-to-face meeting between plaintiff and Nurse White to a 6/18/2015 chart note.  Gulick Decl. Attach. 1, 5-7.

Plaintiff submitted a kyte to Dr. Gulick stating that, "During the last three medical appointments that you have seen me, you told me that because of my contraband charges, 'I can't be trusted to be given pain medication.'"  Plaintiff asked for an explanation.  Pl.'s Second Aff. Ex. 87.  Dr. Gulick responded on May 28, 2015:

> Not so at all.  You have minimal exam or x-ray findings.  I believe you have dominant addiction issues.  If we could find support for Neurontin or narcotics we would give you them crushed.  Nothing supports you getting them.  I again suggest you address your continued in corrections drug abuse problem.

Pl.'s Second Aff. Ex. 87.

Plaintiff asked for Neurontin again at a July 1, 2015 appointment.  The chart note reflects he was "still off neurontin (abuse) but would like back –not indicated."  Gulick Decl. Attach. 1, at 5.

Plaintiff was scheduled for a second cortisone injection on September 15, 2015.

Plaintiff submits the declarations of six inmates complaining about the medical care provided to them at the Oregon State Penitentiary and, specifically, Dr. Degner's denial of narcotics or other effective pain medications.  These declarations are irrelevant as they describe only each individual inmate's experience with their own medical care, and they complain about Dr. Degner's care, who is not a defendant in this lawsuit.

A.    Dr. Shelton

Plaintiff complains about Dr. Shelton's November 23, 2014 response to a grievance in which he agreed with others that it was "not the standard of practice to prescribe narcotic pain management for chronic or neurologic pain." Compl. 45, ¶ 135, Ex. 39.  Plaintiff also alleges Dr.

Shelton failed to investigate plaintiff's complaints about the lack of proper care.  Supp. Compl. 6, ¶ 12.

Defendants argue Dr. Shelton was insufficiently personally involved to support liability. The question arises whether plaintiff has identified specific facts demonstrating the existence of genuine issues for trial.  As I indicated above, in the Ninth Circuit, "a prison administrator can be liable for deliberate indifference to a prisoner's medical needs if he 'knowingly fail[s] to respond to an inmate's requests for help." *Peralta*, 744 F.3d at 1086.

Plaintiff relies on several grievance appeal responses completed by Dr. Shelton, one in November 23, 2014 supporting the denial of narcotics, and several on May 8, 2015 supporting Dr. Gulick's discontinuation of Neurontin, the denial of other pain medications or additional examinations, and dispensation of medications from the medication line.  Pl.'s Second Aff. Exs. 46, 61, 67, and 75.[12]

Setting aside the question of whether Shelton was involved in the decision to deny the requested health care or had control over the medical care given to plaintiff, as I indicate below in analyzing plaintiff's claim against Dr. Gulick, plaintiff fails to point to any evidence that Dr. Shelton knew of an excessive risk to plaintiff's health caused by the denial of medical care. More specifically, plaintiff fails to present evidence from which a jury could reasonably conclude he is entitled to a verdict in his favor on the issue of the necessity of narcotics, and any improper motivation to discontinue Neurontin, treatment of plaintiff's symptoms, or denial of in-cell

---

[12] Plaintiff also mentions Michael Gower's second appeal responses, but he is not a defendant in this case.

medications.  *See Toguchi*, 391 F.3d at 1057-58 (prison official is deliberately indifferent if knows of and disregards an excessive risk to inmate's health).

B.    Coffey

On September 8, 2014, plaintiff complained to Coffey about inadequate medical treatment and pain control.  Coffey (as a supervisor on Christina Jensen's response) explained in a September 24 response that plaintiff had been treated by medical providers and that morphine or demerol are not standard treatments for chronic or neurologic pain.  They thought that the medical care plaintiff was being provided was medically appropriate.  Compl. ¶¶ 130, 132, Pl.'s First Aff. Exs. 42, 44.[13]

Based on the care plaintiff received up until Coffey's September 24 response, there is no evidence Coffey knew of an excessive risk to plaintiff health caused by the denial of care.

C.    Dr. Gulick

Plaintiff alleges in his Supplemental Complaint that he had been taking Neurontin for his sciatic pain for approximately three years when he was transferred from OSP to SRCI.  At the time of his transfer, Dr. Gulick discontinued plaintiff's Neurontin.  Dr. Gulick did not meet with him before discontinuing his pain medication.  Pl.'s Second Aff. ¶ 70-97.

Plaintiff remembers meeting with Dr. Gulick in mid-March 2015.  At that appointment, plaintiff remembers Dr. Gulick told him he would not prescribe pain medications to plaintiff due to plaintiff's contraband charge.  Nursing staff met with plaintiff on April 24, 2015 and told him

---

[13] Plaintiff references two other interactions with Coffey regarding obtaining a new mattress in February and August 2012.  Compl. 42, ¶¶ 121, 122.  Coffey merely referred his request, which the TLC Committee denied in February.  Regardless, plaintiff had obtained a new mattress by October 2012.  Gulick Decl. ¶ 9.

he could have ibuprofen.  Dr. Gulick also declined to allow plaintiff to keep his medications in

his cell.  In response to plaintiff's request to be placed back on Neurontin in July 2015, he was

scheduled for another cortisone injection.

Plaintiff's claim against Dr. Gulick requires him to "show that the course of treatment

[defendant] chose was medically unacceptable under the circumstances, and [he] must show that

[defendant] chose this course in conscious disregard of an excessive risk to plaintiff's health."

*Jackson*, 90 F.3d at 332.

Dr. Gulick decided to discontinue plaintiff's prescription for Neurontin after reviewing

plaintiff's chart.  Accepting plaintiff's version of the facts, Dr. Gulick did so out of concern for

plaintiff's previous contraband charges, which included providing Neurontin to another inmate.

In addition to Dr. Gulick's concern about plaintiff's previous misconduct, however, Dr. Gulick

also explained in response to plaintiff's kyte that plaintiff had "minimal exam or x-ray findings"

and that "nothing supports" plaintiff receiving narcotics or Neurontin.  Pl.'s Second Aff. Ex. 87.

Nothing prohibited Dr. Gulick from considering plaintiff's previous misconduct in assessing the

necessity of a prescribed medication when the record reflects he also reviewed the chart and

concluded plaintiff's minimal examination findings did not support the need for the medication.

Plaintiff's disagreement about the type of pain medication he should have been prescribed

is merely a difference of opinion and does not amount to deliberate indifference.  Prison

providers offered plaintiff ibuprofen or Tylenol, and courts have routinely found that providing

over-the-counter medication in lieu of narcotic pain medication does not provide the basis for an

Eighth Amendment claim.  *Heilbrun v. Villanueva*, 3:14-cv-1706-SI, 2016 WL 3200121, at *3-4

(D. Or. June 7, 2016); *Jackson v. Multnomah Cty.*, No. 3:12-cv-00764-SI, 2013 WL 428456, at

*6 (D. Or. Feb. 4, 2013); *Fields v. Roberts*, No. 1:06-cv-00407-AWI-NP PC, 2010 WL 1407679,

at *4 (E.D. Cal. Apr. 7, 2010); *Estrada v. Malo-Clines*, No. C 10-4832 LHK (PR) 2011 WL

768824, at *2 (N.D. Cal. Feb. 25, 2011) (in context of preliminary injunction request, even

though other inmate receiving methadone or gabapentin for back problem, plaintiff "is not

entitled to medication of his choice"); *Elliott v. Tseng*, No. 2:11-cv-03118 KJM DAD P, 2014

WL 3966377, *19 (E.D. Cal. Aug. 13, 2014) (medically acceptable to discontinue opioids in

favor of NSAIDs, and citing three other cases for this proposition).  The evidence shows, as I

summarized above, that medical providers gave plaintiff an extra mattress, extra pillow, and

extra blanket over the course of years, that he did well off of Neurontin from November 2011 to

July 2013, that x-rays showed no demonstrative change in his degenerative spine condition

between 2011 and November 2013, that he received cortisone injections in October 2014 and

September 2015, and that he was offered ibuprofen and Tylenol for pain control.

Plaintiff submits excerpts from a medical textbook and other online sources, but since no

expert relies on these sources, I may not consider them.  *See* Fed. R. Evid. 803(18) (medical

articles admissible as substantive evidence if from a reliable medical authority and relied on by a

medical expert witness).  No doctor diagnosed plaintiff with sciatica.  In any event, Dr. Gulick

explains treatment for sciatic nerve pain involves: (1) drugs that help reduce inflammation, like

ibuprofen, or oral steroids; (2) epidural steroid injections; (3) physical therapy; and (4) surgery.

Gulick Decl. ¶ 3.  None of the medical providers treating plaintiff recommended narcotics for

plaintiff's pain.

Plaintiff complains about receiving his medications from the cart, rather than being

permitted to keep them in his cell.  Plaintiff's own exhibits contradict any basis from which a

Page 48 - OPINION AND ORDER

jury could conclude Dr. Gulick was deliberately indifferent.  *See* Pl.'s Second Aff. Ex. 73

(medication cart helps to track medication compliance by administering medications via

registered nurses); Ex. 75 (medication cart helps to track what inmates are taking).

In short, viewing the evidence in the light most favorable to plaintiff, he has failed to

show that the chosen course of treatment "was medically unacceptable under the circumstances"

and was chosen "in conscious disregard of an excessive risk to plaintiff's health."  *Jackson*, 90

F.3d at 332; *see also Estelle v. Gamble*, 429 U.S. 97, 107 (1976) ("A medical decision not to

order an X-ray, or like measures, does not represent cruel and unusual punishment.  At most it is

medical malpractice, and as such the proper forum is the state court[.]").

## CONCLUSION

Based on the foregoing, defendants' motions for partial summary judgment (ECF No. 59)

is denied as moot and their motion for summary judgment (ECF No. 111) is granted as to Claims

One, Three, Four, Five, and the Supplemental Complaint.  Defendants' motion for summary

judgment is deferred as to a portion of Claim Two and as to Parker only.  As a result, all of the

defendants in the case are dismissed with prejudice, with the exception of Parker.  Defendants are

directed to provide to the Court a copy of the video by October 14, 2016.  Should I require

additional briefing following my review of the video, I will request it.

IT IS SO ORDERED.

DATED this _____29th_____ day of September, 2016.


  _/s/ Garr M. King_____
Garr M. King
United States District Judge


Page 49 - OPINION AND ORDER